<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HASSAN CHILDS | No. 22cr30 (EP)<br><br>**OPINION** |

**PADIN, District Judge.**

Defendant Hassan Childs moves to suppress the fruits of the stop and search at issue in this action. D.E. 77 ("Defendant's Motion" or "Def. Mot."). The Government opposes. D.E. 98 ("Government's Opposition" or "Gov. Opp'n"). Defendant replies. D.E. 101 ("Def. Reply").

On June 3, 2025, the Court held an evidentiary hearing to address conflicting assertions regarding the frisk and subsequent search of Defendant (and the fanny pack he was wearing). *See* D.E. 99. Following the hearing, the parties submitted simultaneous briefing. D.Es. 132 ("Government's Supplemental Brief" or "Gov. Supp. Br.") & 133 ("Defendant's Supplemental Brief" or "Def. Supp. Br.").[1] With the benefit of the parties' supplemental briefs, the Court now writes to resolve: (1) Defendant's Motion; as well as (2) the Government's motion *in limine* to

---

[1] The parties' supplemental briefs were due on June 24, 2025. According to CM/ECF, the Government filed its Supplemental Brief on June 24, 2025, at 9:50 PM. Defendant's Supplemental Brief was filed on June 25, 2025 at 12:11 AM. The Court notes the timing of the parties' submissions because Defendant explicitly incorporates arguments from the Government's Supplemental Brief into his submission. *See* Def. Supp. Br. at 25 n.5 (quoting the Government's Supplemental Brief).

While the Court considers Defendant's briefing in full, the Court nevertheless notes that Defendant's Defense Counsel's conduct goes against the spirit of simultaneous briefing, which Defense Counsel proposed to the Court. *See* D.E. 108 ¶ 2. The purpose of simultaneous briefing is undermined when one party has the benefit of previewing and addressing their adversary's arguments.

admit two of Defendant's prior convictions under Federal Rule of Evidence 404(b).  D.E. 90

("Government's Motion" or "Gov. Mot.").[2]  For the reasons that follow, the Court will **DENY**

Defendant's Motion and **GRANT in part** and **DENY in part** the Government's Motion.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

### A.    Summary of the Stop and Search of Defendant (As Explained In Previous Filings)

In early June 2021, a recently arrested confidential informant ("CI") told officers in the

Essex County Sheriff's Office ("ECSO") that a short and stocky black male with short hair, a full

beard, and glasses was selling illegal prescription pills near Avon Avenue and South 10th Street

in Newark, New Jersey.[4]  D.E. 77, Ex. A ("Incident Report") at 1.  According to law enforcement,

this is an area known for open-air drug trafficking.  *Id.*  The CI also informed officers that this

individual drove a gold Buick with dark tinted windows bearing New Jersey temporary license

plate number W140318 (the "Buick"), a vehicle known by law enforcement to frequent the area

where the CI placed it.  *Id.* at 1-2.  In addition, the CI told law enforcement that Defendant is

"known to carry a firearm in his black Nike fanny pack."  *Id.* at 2.

Based on this information, around 1:00 PM on June 11, 2021, law enforcement conducted

surveillance in the area.  *Id.*  One member of law enforcement—Detective Nicholas Rodriguez—

saw a gold Buick with a license plate number matching the one provided by the CI parked in the

---

[2] Defendant opposes the Government's Motion.  D.E. 97 ("Defendant's Opposition" or "Def. Opp'n).  The Government replies.  D.E. 102 ("Government's Reply" or "Gov. Reply").

[3] When deciding a motion to suppress, "the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."  *United States v. Raddatz*, 447 U.S. 667, 679 (1980).

[4] The CI had been arrested for selling illegal prescription pills in Newark, New Jersey, and according to the Government, provided information to law enforcement in the hope of reducing his sentence.  Gov. Opp'n at 1.

driveway of a house on Avon Avenue, partially blocking the sidewalk, and protruding out onto the street. *Id.* A few moments later, a man[5] matching the CI's description—a short stocky black male with a full beard and glasses wearing a black Nike fanny pack around his torso—exited the front door of the house and opened the Buick's front passenger side door. *Id.* Then, the individual opened the back passenger side door, removed a large bag from the back seat area of the car,[6] and placed it inside of the trunk. *Id.* At this point, Detective Rodriguez "advised back up units of his observations." *Id.*

Although the parties have differing accounts of what happened next, they seem to agree that law enforcement announced themselves as police, approached Defendant, and then Detective Dominick Petrucci frisked Defendant's black Nike fanny pack. *Id.*; Def. Mot. at 5. Detective Petrucci claims to have "immediately felt what seemed like loose round pills that were not contained within a bottle" inside the fanny pack and then subsequently opened the fanny pack. Incident Report at 2. According to Defendant:

> Officers ran toward me and announced themselves as police. I was told to put my hands up and I complied. The officer closes [sic] to me put one hand on the "fanny pack" I had around my chest and frisked my body with his other hand. Immediately after frisking me the officer removed the "fanny pack" from my person and asked me "where is the weapon?" He then proceeded to unzip the "fanny pack" and search through it. The officer then unzipped the inner pocket of the "fanny pack" and began removing my identification, miscellaneous cards and 2 chains before removing the pills which were in a small sandwich bag.

Childs Affidavit ¶ 4.

---

[5] Later identified as Defendant.

[6] Defendant states this was a boxed child's car seat. D.E. 77, Ex. B, Affidavit of Hassan Childs, ("Childs Affidavit" or "Defendant's Affidavit") ¶ 3. Defendant signed and dated the Affidavit on March 1, 2025. *See id.*

Law enforcement recovered fourteen yellow round pills from the fanny pack, which were suspected (and later confirmed) to be oxycodone.  Incident Report at 2; *see also* Gov. Opp'n at 2. Officers then arrested Defendant for unlawful possession of the pills.  Incident Report at 2.

Defendant refused to provide consent to search the Buick.  *Id.*  Law enforcement then conducted a canine sniff of the Buick, which yielded a positive indication for weapons in the trunk. *Id.*  After obtaining a search warrant for the Buick,[7] law enforcement found a Smith & Wesson, model 17-2, .22 caliber six-shot revolver, bearing serial number K786158, loaded with six rounds of ammunition in the center console of the car.  Gov. Mot. at 3.

**B.    Previous Court Filings**

Defendant initially challenged the constitutionality of the stop and search on June 11, 2021. Def. Mot.  Based on the above record, and in advance of the evidentiary hearing, the Court found that the CI's tip, corroborated by law enforcement's day-of observations in several meaningful respects, provided law enforcement with reasonable suspicion to conduct a stop of Defendant pursuant to *Terry v. Ohio*.  D.E. 122 (quoting and citing 392 U.S. 1, 88 (1968)).  Thus, at the evidentiary hearing, the issue before the Court was whether the frisk of Defendant's fanny pack comported with *Terry* and provided law enforcement with probable cause to search it.

**C.    The June 3, 2025, Evidentiary Hearing (the "Hearing")**

*1.    Detective Petrucci*

The Government called one witness:  Detective Petrucci.  Prior to the stop of Defendant, Detective Petrucci had conducted hundreds of frisks and pat-downs since becoming a detective in 2017; many of these stops involved individuals with fanny packs.  D.E. 130 ("Hearing Transcript" or "Tr.") at 7:17-9:11.  Concerning the investigation in this matter, Detective Petrucci testified that

---

[7] D.E. 77, Ex. C at 9-11 (the "Search Warrant").

he was given information about a vehicle and its occupant, including that the occupant was known to carry a weapon. *Id.* at 10:12-17. However, Detective Petrucci could not recall whether he was given a further description of the occupant. *Id.* at 10:18-19. Consistent with the Incident Report, Detective Petrucci testified that Detective Rodriguez acted as a "spotter" and relayed his observations to back-up units (including Detective Petrucci). *Id.* at 11:13-22, 35:21-36:3; Incident Report at 2.

After some of the information from the CI was corroborated (from afar),[8] law enforcement (including Detective Petrucci) came to the address where Detective Rodriguez spotted the Buick. Tr. at 12:2-6. Defendant was wearing a fanny pack across his chest on an angle, although Detective Petrucci could not "remember visually" exactly how it was worn. *Id.* at 12:24-13:5. Detective Petrucci noted that "typically, individuals that are armed do carry the weapon in the fanny pack a lot of the time." *Id.* at 12:22-23. Thus, when a bag is worn in that manner, he "would feel the whole thing because I mean a -- a gun could be -- you could have a small gun. It could fall into the bottom of that bag, so I would feel the whole thing." *Id.* at 14:19-21.

After stopping the Defendant, Detective Petrucci frisked the fanny pack for the weapon. *Id.* at 13:8-9. When asked to be more specific, Detective Petrucci stated he "just pretty much grab[bed] it and fe[lt] for any items inside." *Id.* at 13:14-15. When he frisked the fanny pack, Detective Petrucci felt what he identified, through his "training and experience" as loose pills (*i.e.*, "not bound together tightly") at the bottom of the bag. *Id.* at 13:10-12, 13:17, 13:21. He did not know whether the pills were located inside an interior mesh pocket of the fanny pack. *Id.* at 27:21-24. Detective Petrucci also could not discern from his frisk of the fanny pack whether the items

---

[8] When asked if the tip was corroborated, Detective Petrucci stated "Yeah. As far as I'm aware, the information he had was corroborated and we moved in, detained the individual, and further investigated it at that time." Tr. at 12:4-6.

he felt were contraband, over-the-counter medications, or even small candies. *Id.* at 36:24-37:8. But when asked whether he therefore "guessed" that the items were contraband, Detective Petrucci stated that he did not, but rather, "went off of [his] training and experience and the information that was given to [him] by Detective Rodriguez." *Id.* at 37:13-15. He did not document the pills' specific location inside the fanny pack in any write-ups or reports. *Id.* at 27:25-28:4.

Detective Petrucci could not recall whether several items that were in Defendant's possession were in the fanny pack or on Defendant's person when Defendant was frisked. *Id.* 13:24-25, 32:17-24; Hearing Def. Ex. 10 ("Personal Property Sheet").[9] These items include a toothbrush, toothpaste, a credit card, two cell phones, and money.[10] Personal Property Sheet. When asked whether he documented whether these items were found (*i.e.*, within the fanny pack or from Defendant's person), Detective Petrucci testified that he does not "believe it's documented where those items were found." *Id.* at 33:4-5.

Detective Petrucci could not recall whether he or anyone in law enforcement asked Defendant if he had a prescription for the pills he was carrying. *Id.* at 39:15-18. He also did not know how many OxyContin pills an individual can legally carry in New Jersey outside a prescription bottle. *Id.* at 41:7-10.

### 2. *Investigator de Bourmont*

The defense called one witness: Martin de Bourmont, an investigator in the Federal Public Defender's Office. *See* Tr. at 44. Mr. de Bourmont was not present when the fanny pack was

---

[9] The Personal Property Sheet is a form from the ESCO. It was first signed by Detective Petrucci on the date of arrest at 3:30 PM. *Id.*

[10] In addition, the Personal Property Sheet indicates Defendant also had a watch, hat, and necklace (or two) in his possession.

frisked and searched on June 11, 2021.[11]  *Id.* at 52:25-53:2.  He collected a black Nike fanny pack from Yasmeen Rand (Defendant's significant other) in March 2025.  *Id.* at 44:14-23.  He also provided a physical description of the fanny pack he collected, including that it is made of a canvas material, has three zippers, two interior mesh compartments, and "fairly thick" padding.  *Id.* at 45:7-11, 50:25-51:5.  Mr. de Bourmont learned from Defendant that the fanny pack contained several items when Defendant was frisked by Detective Petrucci.  *Id.* at 50:25-51:22; *see also* Personal Property Sheet.  Specifically, Mr. de Bourmont learned from Defendant that inside the fanny pack were a toothbrush, toothpaste, credit cards,[12] two cell phones, money, and drugs.  *Id.* at 51:6-22.

## II.    FINDINGS FROM THE HEARING

The Court has a responsibility to determine the credibility of witnesses at an evidentiary hearing when deciding a motion to suppress evidence.  *See United States v. Harris*, Crim. No. 20-679, 2023 WL 5425395, at *4 (D.N.J. Aug. 23, 2023) (citing *United States v. Howard*, 787 F. Supp. 2d 330, 331 (D.N.J. 2011)).  "As the finder of fact, the [C]ourt can accept or reject any or all of a witness's testimony."  *Howard*, 787 F. Supp. 2d at 332 (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)).

---

[11] Indeed, Mr. de Bourmount recognized he ultimately has no way of knowing whether the fanny pack brought to the Hearing was the fanny pack Defendant was wearing when frisked by Detective Petrucci.  Tr. at 56:13-17.

[12] There is a discrepancy between the Personal Property Sheet and Mr. de Bourmont's testimony at the Hearing with respect to how many credit/bank cards were in Defendant's possession.  The Personal Property sheet states there was a single "credit card."  Similarly, during the cross-examination of Detective Petrucci, Defense Counsel asked where there was "one bank card" listed on the Personal Property Sheet.  Tr. at 34:12-13.  However, during the direct examination of Mr. de Bourmont, Defense Counsel asked if there were "credit card*s*" in the fanny pack, to which Mr. de Bourmont answered "yes."  *Id.* at 51:15-16 (emphasis added).

Credibility determinations are made in consideration of several factors, including: (1) the witness's demeanor and manner while testifying; (2) the witness's ability to accurately recollect the matters at issue; (3) the manner in which the witness may be affected by the outcome; (4) the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case; and (5) the extent to which the testimony withstands a common sense test of reason and logic. *Murphy*, 402 F. Supp. 2d at 569; *see also Howard*, 787 F. Supp. 2d at 332 (analyzing the factors set forth in *Murphy*).

As explained in more detail below, Defendant's assertions regarding the lack of testimony at the Hearing as to certain topics—either from Detective Petrucci or uncalled witnesses—miss the point. An evidentiary hearing is not intended to supplant the record before the Court; it is intended to complement and supplement the record so that the Court can resolve factual disputes raised by the parties. Therefore, it is not whether Detective Petrucci's and Mr. de Bourmont's testimony in a vacuum provides the Court with an answer to every question, but rather, whether, when reviewing the testimony in conjunction with the other submissions from the parties, the Court can determine whether the witnesses corroborated, supplemented, or contradicted the other materials in the record.

## A. Detective Petrucci

Against this backdrop, the Court first makes several observations regarding the testimony of Detective Petrucci, the main witness at the Hearing. Detective Petrucci appeared nervous on the stand. He often stammered while testifying and seemed confused by questions on both direct and cross-examination. Detective Petrucci notably could not recall many details while testifying (both on direct and cross-examination) and he stated he did not know the answers to many questions. *See* Def. Supp. Br. at 8-9 (listing 18 questions which Detective Petrucci could not answer while testifying). These questions ran the gamut from smaller details to key questions,

8

including whether there were other items in the fanny pack he frisked or whether the fanny pack was open or closed when he patted it down. *See id.* (citations to Transcript omitted).

While Defendant understandably devotes much of his Supplemental Brief to critiquing Detective Petrucci's testimony, the Court disagrees with Defendant's characterizations of Detective Petrucci's testimony and finds that his testimony—including his failure to recall certain details—does not present contradictions or inconsistencies either internally or with extrinsic evidence. In the Court's view, Defendant Petrucci attempted to honestly answer questions as best and carefully as he could without overstating his memory. *See, e.g.*, *infra* Section II.5. He seemed consistently reluctant to testify as to details he could not recall with certainty. However, when presented with information (or documents to refresh his recollection) from both parties, Detective Petrucci was generally quick to agree with the information before him.

The Court agrees with the Government's description of Detective Petrucci's testimony: while he "did not claim to remember every moment of the arrest in 2021 in excruciating detail— no law enforcement officer making hundreds of arrests would—[] the key details that he could recall are corroborated by the other findings and by the information provided by the CI that served as the basis [] for the *Terry* stop and the arrest that followed." Gov. Supp. Br. at 4. Nevertheless, given the importance of Detective Petrucci's testimony to resolving the outstanding issues regarding the frisk and search of Defendant's fanny pack, the Court will address below several issues raised by Defendant regarding Detective Petrucci's testimony.

  *1. What Detective Petrucci knew prior to the frisk*

Defendant contends that Detective Petrucci's testimony contradicted the Incident Report because "he did not testify that the tip was ever conveyed to him, that he knew of the description of the person that was being searched for, or that the observations of Detective Rodriguez were

conveyed to him." Def. Supp. Br. at 12 (citing Tr. at 12-13); *see also id.* at 22 n.4 ("[T]here is no evidence [Detective Rodriguez] conveyed that he had knowledge that [Defendant] was 'armed and dangerous' directly to Detective Petrucci before Detective Petrucci seized [Defendant]."). At another point, Defendant states that "no information was elicited that Detective Petrucci was aware of *any* alleged anonymous tip or the details of such tip as recounted in the police report authored by Detective Rodriguez." Def. Supp. Br. at 4 (emphasis added).

Defendant mischaracterizes Detective Petrucci's testimony. Detective Petrucci's testimony plainly belies Defendant's repeated claims that Detective Petrucci was unaware of *any* of the information provided by the CI: Detective Petrucci testified that he (and law enforcement) were looking for a specific vehicle and that he was told the occupant of the vehicle was known to carry a weapon. *See* Tr. at 10:10-23. He also testified that he determined the items he felt in the fanny pack during the frisk were contraband in part based on "the *information that was given to [him] by Detective Rodriguez.*" Tr. at 13-15 (emphasis added).

While it is true that Detective Petrucci failed to recall certain aspects of the CI's tip, his testimony did not actually *contradict* the Incident Report written by Detective Rodriguez, which was written under two hours after the arrest,[13] and which stated that law enforcement was "armed with [the] information" provided by the CI and that Detective Rodriguez "advised back up units of his observations." Incident Report at 2. Detective Petrucci also testified that "as far as [he is] aware, the information . . . was corroborated and [law enforcement] moved in, detained the individual, and further investigated it at that time." Tr. at 12:4-6. Between the Incident Report and Detective Petrucci's testimony, the Court finds that law enforcement (including Detective Petrucci) was aware of the totality of the CI's tip—including that the individual was known to

---

[13] *See* Incident Report at 2 (dating the time of the report to 2:37 PM).

carry a firearm and pills in his black Nike fanny pack—as well as Detective Rodriguez's day-of observations from when he was initially acting as a spotter.

### 2.    The location of Defendant's fanny pack on his body

Defendant raises another supposed contradiction in Detective Petrucci's testimony:  that Detective Petrucci "first testified that Defendant wore the fanny pack across his chest; but then immediately stated that he couldn't 'visually remember'" how Defendant wore the fanny pack. Def. Supp. Br. at 23 (quoting Tr. at 12, 13).  At the Hearing, Detective Petrucci testified as follows:

> Q. [W]as there anything the defendant was wearing that you can recall?
> A. He had the fanny -- a fanny pack on. I don't remember his clothing description, but I remember he was in possession of a fanny pack. And I mean, typically, individuals that are armed do carry the weapon in the fanny pack a lot of the time.
> Q. Where was the defendant wearing the fanny pack?
> A. Across the chest.
> Q. Would you say across the body, effectively?
> A. I would say -- I don't remember visually, but typically that's how you wear it. Otherwise, it would, like, not – it would -- it would fall. It's put on an angle across your chest.

Tr. at 12:18-13:5.

Defendant's selected excerpt of Detective Petrucci's testimony does not raise a contradiction with his other testimony.  As the record shows, Detective Petrucci testified that Defendant was wearing the fanny pack across his chest, although he did not recall exactly how it was worn across his chest.  He assumed that it was worn on an angle because that is typically how a fanny pack is worn (otherwise it would fall down).  In the Court's view, this is a witness attempting to not overstate his recollection of an event that took place nearly four years ago to the date.  Moreover, whether Detective Petrucci "visually" remembers how Defendant wore the fanny pack across his chest misses the broader (and more significant) point:  that Detective Petrucci recalled that Defendant was wearing the fanny pack across his chest on an angle, and it was the fact it was on his chest that impacted his approach to the frisk.  *See id.* at 13:17-21.

11

### 3. *The location of the pills within the fanny pack*

Next, Defendant notes that while on direct, Detective Petrucci testified that he identified loose pills inside the fanny pack "at the bottom of the bag," *id.* at 13:18, but later "testified that he could not remember where [the pills] were," Def. Supp. Br. at 23 (citing Tr. at 27-28). For completeness, here is the excerpt from the cross-examination of Detective Petrucci:

> Q. And those pills were located inside the fanny pack, correct?
> A. Yes.
> Q. And those pills were located inside of the mesh pocket that we just discussed, correct?
> A. I don't know exactly where in the fanny pack. I don't remember exactly where it was, which pocket.
> Q. Did you document where the pills were located?
> A. Just inside the fanny pack.
> Q. Did you document their specific location inside the fanny pack?
> A. No.

Tr. at 27:18-28:4.

Once reviewed within the proper context, Detective Petrucci's testimony is not contradictory. On direct, he testified that the pills were located in the bottom of the fanny pack. On cross, Detective Petrucci testified that he "did not remember exactly" where the pills were located in response to Defense Counsel's specific question about whether the pills were located inside of an interior mesh pocket. Indeed, Detective Petrucci's statement about not remembering exactly where the pills were located was followed by "which pocket," further indicating his testimony was limited to the specific question posed. In the Court's view, it makes sense that Detective Petrucci recalled that the pills were at the bottom of the bag (a fact he could ascertain from the initial frisk and which was germane to the frisk) as opposed to which internal pocket the pills were in (something he could only identify once he opened the bag). According to Defendant, the pills were in a small sandwich bag inside an inner pocket. Childs Affidavit ¶ 4. Detective Petrucci's testimony would be consistent were the pills to have fallen to the bottom of that inner

12

pocket (*i.e.*, the pills were at the bottom of the fanny pack inside the mesh pocket pocket)—the area Detective Petrucci specifically noted a firearm could have been and where he needed to search.[14]  Accordingly, on the record before the Court, Detective Petrucci's testimony is credible on this issue.

#### 4.    *Whether there were other items inside the fanny pack during the frisk*

Defendant also notes that Detective Petrucci testified that he could not recall whether certain items listed on the Personal Property Sheet were inside the fanny pack during the frisk. Def. Supp. Br. at 23 (citing Tr. at 32).  Defendant argues that it "goes against common sense that [Defendant] would have carried an empty fanny pack—containing only fourteen pills of oxycontin, and then loaded up his pockets with multiple cell phones, a toothbrush, toothpaste, cash and a bank card, or carried these items in his hands."  Def. Supp. Br. at 23-24.

The Court understands why Defendant argues it is highly unlikely that *all* of the items on the Personal Property Sheet were on Defendant's person (and that Defendant was wearing an empty fanny pack), but it is not clear from the record where each item on the Personal Property Sheet was located at the moment of the frisk.  For example, many people carry cash, credit cards, and cell phones in their pants pockets.  In that event, there might only have been a toothbrush and toothpaste inside the fanny pack.  Defendant himself makes no mention of two cell phones, a toothbrush, or toothpaste being inside the fanny pack; in his Affidavit, he only states that his "identification, miscellaneous cards and 2 chains" were in the fanny pack (in addition to the pills). Childs Affidavit ¶ 4.  While the Court will not, it *could* infer, based on Defendant's Affidavit, that the items he does not explicitly list as being in the fanny pack were not in the fanny pack.

---

[14] Tr. at 14:19-21.

Given the uncertainties in the record, the Court cannot conclude which items on the Personal Property Sheet were inside the fanny pack when Defendant was frisked. Thus, Detective Petrucci's testimony on this front (and his inability to recall where these items were located) does not render him an unreliable witness. Detective Petrucci did not testify that *no* items were in the fanny pack (besides the pills), but rather, that he did not know whether certain items on the Personal Property Sheet were inside the fanny pack. *See, e.g.*, Tr. at 28:5-9. There is a significant difference between those two statements. The Court will not conclude that an inability to recall certain details renders Detective Petrucci's testimony unreliable, or that certain items on the Personal Property Sheet were in one place or another during the frisk.

5. *Detective Petrucci's frisk of the fanny pack*

Defendant also highlights that Detective Petrucci first "testified that he 'grab[bed]' the fanny pack and 'fe[lt] for any items inside,' but then later testified that he could not remember how he frisked the fanny pack." Def. Supp. Br. at 23 (quoting Tr. at 13, 21). Here is Detective Petrucci's testimony on direct:

> Q. Okay. What did you do upon seeing him and beginning your interaction?
> A. I think the first thing I did was, we stopped him. I frisked the fanny pack at that point for the weapon, potentially. And when I did frisk the fanny pack, I felt what I identified, through my training and experience, as loose pills inside the fanny pack.
> Q. Can you be a little more specific about what it meant to "frisk the fanny pack"? What you did with your hands?
> A. Just pretty much grab it and feel for any items inside.
> Q. When you felt it, what specifically did you feel?
> A. I felt the pills at the bottom of the bag.

Tr. at 13:5-17. On cross, he testified as follows:

> Q. Okay. When you walked up to Mr. Childs, you patted him down, correct?
> A. Yes.
> Q. And on direct you stated that you were not sure how the fanny pack was on Mr. Childs; is that correct?
> A. Yes.

14

Q. When you patted him down, was the fanny pack still on his person?
A. Yes.
Q. And you patted down with one hand?
A. I don't remember exactly how I would have done it. I most likely would do it with both of my hands.
Q. Okay. And when you patted down the fanny pack, you were looking for a firearm, correct?
A. Yes.
Q. And you felt no firearm, correct?
A. Correct.

*Id.* at 21:11-22:2.

As demonstrated by the testimony set forth above, Defendant has again taken Detective Petrucci's testimony out of context. On cross, Detective Petrucci's statement that he did not remember how he frisked the fanny pack was in response to the *specific question* of whether he used one hand. Detective Petrucci then stated that he "most likely" used both hands. Contrary to Defendant's assertion, Detective Petrucci's response to Defense Counsel's question as to whether he used one hand to frisk the fanny pack does not raise a contradiction with his prior testimony. For a similar reason, the Court rejects Defendant's contention that "all Detective Petrucci could recall was that the fanny pack was still on [Defendant's] person and he could not see inside it," Def. Supp. Br. at 24, as his testimony shows otherwise.

In sum, Detective Petrucci was not a polished witness. But the Court also concludes he was attempting to testify to the best of his ability regarding an incident that took place nearly four years before the Hearing. As Detective Petrucci said at the Hearing, he has been a part of hundreds of arrests, Tr. at 7:17-8:14, and the Court credits this experience when evaluating his testimony. The Court recognizes that Detective Petrucci appeared careful in an effort to not overstate his memory and readily supplemented his testimony when presented with records to refresh his recollection. The Court finds he was a credible witness.

### B.    Investigator Martin de Bourmont

Considering the factors set forth in *Murphy*, 402 F. Supp. 2d at 569, Mr. de Bourmont was prepared, calm, and collected on the stand.  Although the scope of his testimony was limited, he easily recalled facts concerning his collection of the fanny pack in March of 2025 and his related investigation.  Like Detective Petrucci, Mr. de Bourmont is not an interested party to this action, which provides additional credibility to his testimony.

#### 1.    Whether there were other items inside the fanny pack during the frisk

Mr. de Bourmont testified that he learned from Defendant that several items on the Personal Property Sheet (including a toothbrush, toothpaste, two cell phones, a bank card, and cash) were located within the fanny pack. Tr. at 51:6-22. While the Court can rely on hearsay when deciding a motion to suppress, the Court finds this second-hand information inherently less reliable than a first-person account, especially when the source of the information is the defendant (a highly interested party).  Furthermore, Mr. de Bourmont's testimony as to which items were inside the fanny pack includes items that Defendant does not mention in his Affidavit, as Defendant only references his "identification, miscellaneous cards and 2 chains."  Childs Affidavit ¶ 4.  Just like Mr. de Bourmount ultimately has no way of knowing whether the fanny pack brought to the Hearing was the fanny pack Defendant was wearing when frisked by Detective Petrucci, Tr. at 56:13-17, he similarly has no way of ultimately knowing whether all of the items that Defendant told him were inside the fanny pack were actually inside the fanny pack.  Because Mr. de Bourmont learned this information second-hand from Defendant, and because it is not fully consistent with Defendant's Affidavit, the Court will not rely on it to conclude that certain items on the Personal Property Sheet were inside the fanny pack when Detective Petrucci frisked Defendant's fanny pack on June 11, 2021.

### 2. The fanny pack (and the requested adverse inference)

Another issue that arose during both Detective Petrucci's and Mr. de Bourmont's testimony was whether the black Nike fanny pack at the Hearing (which Mr. de Bourmont testified he collected from Ms. Rand in March 2025) was the black Nike fanny pack Defendant was wearing when frisked by Detective Petrucci on June 11, 2021.

The Government asserted at the Hearing and subsequently in its briefing that there is "substantial reason to doubt" that the fanny pack at the Hearing was actually the one worn by Defendant because Detective Petrucci did not recognize it as such at the Hearing,[15] the fanny pack was retrieved from a biased source who did not testify,[16] and multiple shapes and sizes of black Nike fanny packs exist. Gov. Supp. Br. at 4 n.2. Defendant argues that because law enforcement should have collected and retained the fanny pack—but did not—the Court should adopt a negative inference under the spoliation standard. Def. Supp. Br. at 25; *see also* Tr. at 45:16-50:22 (the parties fully stating their positions on this issue).

After the Government objected to the admission of the fanny pack into evidence at the Hearing, Defense Counsel stated that "the only people that could establish [that the fanny pack in the courtroom was the one Defendant wore when frisked] are the people that did not collect that evidence. And so we would ask . . . for an adverse inference in that regard because we could not have collected that evidence any sooner than we did in this case." Tr. at 46:3-7. Later, in response

---

[15] The Government mischaracterizes Detective Petrucci's testimony. Detective Petrucci stated that the fanny pack physically in Court "looks bigger" to him than the one in the photos, rather than that he did not *recognize* the fanny pack in Court. *See* Tr. at 25:8-16.

[16] While the Government states the fanny pack was collected from Defendant's mother, Post. Supp. Br. at 4 n.2, it was collected from Defendant's significant other (Ms. Rand).

to the Undersigned asking whether Defendant could testify that the fanny pack in the courtroom was the fanny pack he wore when arrested, Defense Counsel stated:

> My client could testify to that, yes. But he could not authenticate it because he's been in custody so the same issue would arise. The [G]overnment would throw up its hands and say, Ha, too bad, you weren't there, Mr. Childs, because we left it and we took you into custody.
>
> So that's why I'm asking for an adverse inference in this regard. They had control. They had the ability to do that. They knew. They knew that if they collected that fanny pack, anybody would have said "There's no way you can feel drugs in this," and that's why they didn't collect it. So we're asking for an adverse inference. I'm asking to enter that fanny pack as a fanny pack that Mr. de Bourmont collected from Ms. Rand.

*Id.* at 47:3-16. The Court construes the above, along with Defendant's briefing, as Defendant asking for an adverse inference that the fanny pack that Ms. Rand gave to Mr. de Bourmont in March of 2025 is the one Defendant wore on June 11, 2021, based on law enforcement's failure to collect and retain the fanny pack when Defendant was arrested.

Both parties cite *Brewer v. Quaker State Oil Refining Corp.* as the relevant authority on spoliation. 72 F.3d 326, 334 (3d Cir. 1995). Under *Brewer*, spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and the duty to preserve the evidence was reasonably foreseeable to the party. *Bull v. UPS, Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *id*). In addition, "a finding of bad faith is pivotal to a spoliation determination." *Id.* at 79. "Mere negligence" is not enough. *Orologio of Short Hills Inc. v. The Swatch Grp. (U.S.) Inc.*, 653 F. App'x 134, 145 (3d Cir. 2016) (citing *id.*). In *Brewer*, the Third Circuit made clear that:

> For the [spoliation] rule to apply . . . it must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. *See generally* 31A C.J.S. Evidence § 156(2); then 29 Am.Jur.2d Evidence § 177 ("Such a presumption or inference arises, however, only when the

spoliation or destruction [of evidence] was intentional, and indicates fraud and a
desire to suppress the truth, and it does not arise where the destruction was a matter
of routine with no fraudulent intent.").

72 F.3d at 334.

"An adverse negative inference is an extreme remedy." *McAdams v. United States*, 297 F.

App'x 183, 187 (3d Cir. 2008). District courts have generally held that the party seeking an

adverse inference bears the burden of proof by a preponderance of the evidence (and not by clear

and convincing evidence). *MaxLite, Inc. v. ATG Elecs., Inc.*, No. 15-1116, 2021 WL 4520418, at

*8 (D.N.J. Oct. 4, 2021); *Cianci v. Phoenixville Area Sch. Dist.*, No. 20-4749, 2022 WL 824026,

at *5 (E.D. Pa. Mar. 18, 2022); *cf. Goldrich v. City of Jersey City*, No. 15-885, 2018 WL 4492931,

at *7 n.8 (D.N.J. July 25, 2018), *report and recommendation adopted as modified*, No. 15-885,

2018 WL 4489674 (D.N.J. Sept. 19, 2018) (noting there is an open question as to what standard

applies when considering whether to adopt an adverse inference).[17]

The Court will not adopt an adverse inference because it has not been shown that any

member of law enforcement acted with bad faith in not retaining the fanny pack.[18] Since *Bull*,

---

[17] The Court will not decide which standard of proof applies because the Court's conclusion would
be the same under either standard. *Goldrich*, 2018 WL 4492931, at *7 n.8 (citing *Kavanagh v.
Refac Optical Grp.*, No. 15-4886, 2017 WL 6395848, at *2 n.5 (D.N.J. Dec. 14, 2017)).

[18] To the extent Defendant asserts bad faith based on Defense Counsel's argument at the Hearing
that law enforcement "knew that if they collected that fanny pack, anybody would have said
'There's no way you can feel drugs in this,'" Tr. 47:11-13, the Court rejects this contention. The
Court disagrees with Defendant's perception of the inherent evidentiary value of the fanny pack
or that any value was apparent to law enforcement. Courts have considered similar arguments that
containers like boxes and backpacks (which had contraband inside them, and which were not
preserved by law enforcement) had evidentiary value, and found: (1) these items had little or no
apparent evidentiary value; and (2) that the failure to preserve these containers did not give rise to
bad faith given there was nothing to suggest law enforcement was aware of the usefulness of the
evidence or that law enforcement acted with malicious intent in not preserving these items. *See
United States v. Krumwiede*, Crim. No. 18-274, 2020 WL 6479280, at *2-5 (D. Or. Nov. 3, 2020);
*United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149-50 (9th Cir. 2012). For these reasons,
the Court rejects the implication embedded within Defendant's briefing—that law enforcement

district courts routinely "decline[] to find spoliation where the party's conduct was no worse than negligent, or where the evidence was lost in the normal course of daily business or other similar activity." *Bozic v. City of Washington, Pa.*, 912 F. Supp. 2d 257, 270 (W.D. Pa. 2012).

Putting aside bad faith, Defendant has not established that it was even negligent for law enforcement to have not retained the fanny pack in the first place. At the Hearing, Detective Petrucci testified that the personal property of individuals in custody is not retained by law enforcement, and instead, follows the individual to the jail. Tr. at 31:5-11. Building on this, counsel for the Government stated that items like the fanny pack, which he argued contained "no intrinsic evidentiary value" and were "otherwise benign" and "innocuous," are therefore "recorded in a property sheet and turned back over to the defendant." *Id.* at 49:18-21. In response, Defense Counsel pointed out that law enforcement retained the sandwich bag that the pills were in, which he characterized as an "innocuous plastic bag," similar to the fanny pack. *Id.* at 50:3-5. Although not stated explicitly, it seems Defendant asks this Court to infer that because law enforcement retained one supposedly innocuous item (the sandwich bag that contained the pills), the decision not to retain another item that law enforcement claimed has no inherent evidentiary value (the fanny pack) was deliberate.

The Court disagrees with this line of reasoning. There is a meaningful difference between the plastic bag that actually held the contraband and the fanny pack. On a logistics front, keeping the pills inside the sandwich bag may have been the cleanest and easiest way to transfer the pills into an evidence bag (otherwise, law enforcement would have needed to remove the pills from the

---

deliberately chose to not collect the fanny pack because they knew that a properly authenticated and collected fanny pack would lead to the suppression of evidence. *See United States v. Barton*, 995 F.2d 931, 936 (9th Cir. 1993) (finding no bad faith where nothing indicated that law enforcement destroyed evidence for strategic gain).

sandwich bag only to place them loose inside of the evidence bag).  Plus, bags containing narcotics

are often processed as evidence, even if no tests are performed on the bags themselves.  *See, e.g.*,

*Mearin v. Dohman*, Crim. No. 06-4859, 2013 WL 1187050, at *2 (E.D. Pa. Mar. 21, 2013), *aff'd*,

533 F. App'x 60 (3d Cir. 2013).

Relatedly, Defendant argues that the fanny pack is "obviously relevant to the defenses in

this case and the duty to preserve was reasonably foreseeable because [Defendant] was charged in

the state with drug offenses."[19]  Def. Supp. Br. at 25.  This argument concerning the obvious

relevancy of the fanny pack is tainted by hindsight and Defendant's theory of the frisk.  As

explained in *supra* n.18*,* the Court disagrees with Defendant that the fanny pack had obvious

---

[19] The Court addresses a dispute between the parties regarding the relevancy of the fanny pack to
the charges against Defendant and whether prior efforts could have been made to collect it sooner
(or whether it should have been retained in the first place):

At the Hearing, the Government asserted that an adverse inference was not appropriate because
the significance of the fanny pack would have been obvious to both Defendant and his prior
counsel since Defendant was charged with drug-related charges at the state level in 2021, and
therefore, prior defense counsel could have worked to preserve the fanny pack or bring its
relevance to the Government's attention early in the case.  Tr. 49:12-15; *see also* Gov. Supp. Br.
at 4.  In response, Defendant contends that the Government "only indicted [Defendant] on the drug
charges that make the fanny pack relevant on February 28, 2025. The fanny pack was collected
*three days after indictment on March 3, 2025.*"  Def. Supp. Br. at 25.  Therefore, Defendant argued,
"to go back and say, hey, you know what, they knew those drugs were coming in, they knew there
was going -- they had plenty of time, that's inaccurate."  Tr. at 50:12-14.

Defendant first obtaining the fanny pack within days of the superseding indictment suggests his
belief that the fanny pack is relevant only to the drug-related charges.  *See also* Def. Supp. Br. at
25 (arguing that a duty to preserve the fanny pack was reasonably foreseeable to law enforcement
because Defendant was charged *in the state* with drug offenses initially).  But this conflicts with
Defendant's position that that the firearm (recovered from the Buick) is a fruit from the poisonous
tree because law enforcement only relied on the fruits of the search of the fanny pack (the pills) to
obtain the search warrant for the Buick.  *Id.* at 15 n.3.  If the firearm was recovered downstream
from the search of the fanny pack, then the legality of that search (and the fanny pack itself) have
been relevant, if not essential to any effort to suppress the fruits of the search of the Buick, for
years (and months to current Defense Counsel), as Defendant has been charged with offenses
related to the recovery of a firearm from the Buick since 2022.

evidentiary value to law enforcement at the moment of the frisk. Were the Court to accept Defendant's argument that law enforcement should have retain the fanny pack, the Court would be requiring law enforcement to collect and retain an unknown number of items. For example, a defendant could assert that his pants pockets or coat were too thick for law enforcement to feel contraband through. Under Defendant's logic, law enforcement would be required to retain every pair of pants and every jacket worn by an individual when they are frisked and where contraband is found. The Court cannot find a case imposing any such obligation on law enforcement, nor could it under other cases involving law enforcement's duty to collect physical evidence, including *California v. Trombetta,* 467 U.S. 479 (1984), *Arizona v. Youngblood,* 488 U.S. 51 (1988) and their progeny.[20] And while Defendant cites to other cases where law enforcement preserved seized bags and avers that such collection is "common place," Def. Supp. Br. at 26 (citations omitted), a failure to preserve evidence in violation of a police procedure does not by itself establish bad faith. *United States v. Henry*, 842 F. App'x 809, 815 (3d Cir. 2021) (citing *United States v. Ramos*, 27 F.3d 65, 72 (3d Cir. 1994) (holding that the destruction of evidence in violation of established rules and policy did not, alone, warrant finding of bad faith)). Accordingly, even had Defendant identified a violation of a police procedure by not retaining the fanny pack, he still has failed to establish bad faith.

---

[20] To the contrary, following an evidentiary hearing, a court considered the testimony of an officer who stated that he recognized the feel of pills on his first pass of the defendant's pants pocket during a frisk. *United States v. Avalos Gallegos*, Crim. No. 19-19, 2019 WL 1645998, at *7 (E.D. Ky. Apr. 4, 2019), *report and recommendation adopted sub nom. United States v. Gallegos*, Crim. No. 19-19, 2019 WL 1645212 (E.D. Ky. Apr. 16, 2019). In that opinion, there is no mention that law enforcement kept the defendant's pants (either in the opinion or the transcript of the evidentiary hearing). The exhibit list for the evidentiary hearing does not mention the pants either. *See* D.E. 45 in *United States v. Avalos Gallegos*, Crim. No. 19-19 (E.D. Ky. Mar. 29, 2019).

In sum, the Court will deny Defendant's request for an adverse inference because there has been no showing of bad faith, nor has it been shown that: (1) there was a duty to preserve the fanny pack or (2) that it was reasonably foreseeable to law enforcement on the date Defendant was arrested that the fanny pack had evidentiary value. *See Bull*, 665 F.3d at 73 & 79 (3d Cir. 2012) (citation omitted).

## III.    DEFENDANT'S FOURTH AMENDMENT CHALLENGES

The Court will now consider whether the frisk and search of Defendant's fanny pack violated his Fourth Amendment rights. The Fourth Amendment affords protections against "unreasonable searches and seizures" of a person's "effects." U.S. Const. amend IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). When law enforcement executes a seizure without a warrant, the Government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). Evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018) (citing *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)).

As noted above, the Court previously found that law enforcement had reasonable suspicion to conduct a *Terry* stop of Defendant based on the tip provided by the CI and law enforcement's subsequent observations, which corroborated several key aspects of the CI's tip before approaching Defendant.[21] D.E. 102. Thus, at issue is whether the frisk of Defendant's fanny pack

---

[21] In addition to arguing that Detective Petrucci's seizure of Defendant was unconstitutional, Defendant contends that the "collective knowledge doctrine" cannot save the *Terry* stop of Defendant. Def. Supp. Br. at 18-19. "The collective knowledge doctrine allows imputation of one

23

was: (1) within the bounds of *Terry* and (2) provided law enforcement with probable cause to search the fanny pack.

A determination of the existence of probable cause requires a "totality-of-the circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "[T]he probable cause standard is a 'practical, nontechnical conception' that 'deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v.*

---

law enforcement officer's knowledge to another officer who actually makes a stop, even if the latter does not possess all relevant facts." *United States v. Gonzalez*, 630 F. App'x 157, 161 (3d Cir. 2015). "The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect." *Id.* at 162 (quoting *Rogers v. Powell,* 120 F.3d 446, 453 (3d Cir. 1997)).

Because the law does not require that Detective Petrucci be "aware of the specific facts which led [his] colleagues to seek [his] assistance," *United States v. Hensley*, 469 U.S. 221, 231 (1985), the first question for the Court is whether Detective Rodriguez had reasonable suspicion to effectuate a *Terry* stop. That question was thoroughly considered and answered in the affirmative. *See* D.E. 122. The Court has further considered Defendant's additional arguments in his supplemental briefing, *see e.g.*, Def. Supp. Br. at 19-20, and finds them unconvincing. For instance, while Detective Rodriguez certainly could have provided additional context at the Hearing as to his investigation, it was not necessary for him to do so.

Next, relying on *dicta* in a non-binding district court opinion, Defendant claims that the collective knowledge doctrine cannot apply because Detective Petrucci did not testify that he was advised Detective Rodriguez "had probable cause or reasonable suspicion to arrest [Defendant]." Def. Supp. Br. at 19 (quoting *dicta* in *United States v. Abreu*, Crim. No. 20-642, 2021 WL 3561247, at *6 (D.N.J. Aug. 12, 2021)). This argument is unpersuasive for two reasons. *First*, the Court disagrees with Defendant's reading of *Abreu* and its application to the present case. The issue in *Abreu* was whether a state trooper who stopped a vehicle for a supposed traffic violation in furtherance of a narcotics investigation could after the fact claim that the stop was also supported by reasonable suspicion in connection with that narcotics investigation. That posture is distinguishable from the present matter in several respects, including that in *Abreu*, unlike in the present matter, law enforcement's effort to obtain reasonable suspicion to stop the suspect was predicated on events wholly unrelated to law enforcement's day-of observations. *Second*, the Court previously determined that Detective Petrucci's testimony and the Incident Report written within hours of the arrest sufficiently showed that Detective Rodriguez had communicated the CI's tip and his subsequent observations to other members of law enforcement, including Detective Petrucci, before requesting back-up. *See supra* Section II.A.1.

*Pringle,* 540 U.S. 366, 370 (2003) (quoting *id.* at 231). "To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Gates*, 462 U.S. at 238).

"[P]olice may seize contraband during a lawful pat-down if the contraband's 'contour or mass makes its identity immediately apparent.'" *United States v. Greene*, 927 F.3d 723, 726 (3d Cir. 2019) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). The "plain-feel doctrine" developed in *Dickerson* allows "an officer to seize an object when, given his training and experience, he develops probable cause to believe it is contraband (1) by the time he concludes it is not a weapon and (2) 'in a manner consistent with a routine frisk.'" *Id.* (quoting *United States v. Yamba*, 506 F.3d 251, 257, 259 (3d Cir. 2007)).

An officer conducting a pat-down during a *Terry* stop may "slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon. If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search." *Yamba*, 506 F.3d at 259. However, if the officer "goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* (quoting *Dickerson*, 508 U.S. at 373). The question for the Court is "whether the officer had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *Id.* at 257 (citing *United States v. Jones*, 303 F. Supp. 2d 702, 706 (D. Md. 2004), *aff'd*, 289 F. App'x 593 (4th Cir. 2008)).

At the Hearing, Detective Petrucci testified that he "pretty much grab[bed] [the fanny pack] and fe[lt] for any items inside." *Id.* at 13:14-15. He felt the whole fanny pack because a "small

gun . . . could fall to the bottom of the bag," *id.* at 14:17-21, and that he was told the individual who matched the description of the occupant of the vehicle Detective Rodriguez spotted was known to carry a firearm in his fanny pack, *id.* at 10:12-17.  He further testified that during the frisk, he identified, through his "training and experience," loose pills that were "not bound together tightly" at the bottom of the bag.  *Id.* at 13:10-21.

According to the Government, Detective Petrucci's testimony supports a finding that the frisk did not exceed the bounds of *Terry*.  Gov. Supp. Br. at 4.  Defendant claims this testimony "strains credulity."  Def. Supp. Br. at 23.  Defendant further contends that even if the Court were to credit the testimony, there is not enough evidence for the Government to meet the preponderance standard.  *Id.* at 24.  More specifically, Defendant argues that the Government has failed to show that the frisk did not violate the plain feel doctrine and that "the Court cannot find that the search comported with the Fourth Amendment on a record of an officer stating he can't remember how he conducted the frisk."  *Id.* at 27.

As extensively considered in *supra* Section II.A, the Court is unpersuaded by Defendant's arguments as to why the Court should discredit Detective Petrucci's testimony regarding the frisk of Defendant's fanny pack.  Defendant's arguments rely on a series of misstatements, assumptions, and stretches that the Court will not accept.  For example, Defendant states that Detective Petrucci testified "that he felt loose pills in an unknown location in the fanny pack" and "all Detective Petrucci could recall was that the fanny pack was still on [Defendant's] person and he could not see inside it."  Def. Supp. Br. at 24.  As shown in *supra* Sections II.A.2-3, this is an inaccurate description of Detective Petrucci's testimony.  Similarly, Defendant's assertion that while Detective Petrucci "initially stated the pills were in the bottom of the bag, he later stated he did not know where they were collected from," Def. Supp. Br. at 24, is a mischaracterization of Detective

26

Petrucci's testimony. Detective Petrucci testified that he did not know if the pills were located in an internal mesh pocket when asked that specific question by Defense Counsel; he did not contradict his prior testimony that he felt the pills at the bottom of the fanny pack during the frisk. *See supra* Section II.A.3.

Defendant also argues that "it is not possible that Detective Petrucci could have felt loose pills through the padding of the bag and with all the other items that common sense dictates were in the bag." Def. Supp. Br. at 26. The Cout disagrees for two reasons. *First*, common sense does not dictate that the items Defendant asserts were in the fanny pack were actually there. As noted above, people keep cell phones, money, and credit cards on their person.[22] *Second*, as explained in *supra* Sections II.A.4 and II.B.1, the Court cannot conclude whether the items on the Personal Property Sheet were located in Defendant's fanny pack because of the inconsistent record before the Court, including: (1) Detective Petrucci's testimony that he could not remember where these items were located; (2) Defendant's Affidavit, which makes no mention of the toothbrush, toothpaste, or cell phones being in the fanny pack; and (3) Mr. de Bourmont's testimony, which comes second-hand from Defendant and is not aligned with Defendant's Affidavit (which is dated to a similar time period that Mr. de Bourmont started his investigation). Because it has not been established what items were in the fanny pack during the frisk, the Court cannot discredit Detective Petrucci's testimony that he felt loose pills during the frisk on the grounds that an unknown number

---

[22] Defendant overlooks a more reasonable middle ground in its briefing: that *some* of the items on the Personal Property Sheet, like the toothbrush and toothpaste, were inside the fanny pack, while others (like the cell phones or money) were not. The Court is not forced into concluding, as Defendant suggests, that either Defendant: (1) "load[ed] up his pockets—if he had any—with two cellphones, cash, [a] debit[] card and toiletries, all while carrying an empty fanny pack" or (2) had every item on the Personal Property Sheet inside the fanny pack. Def. Supp. Br. at 27 n.7.

of items may have also been inside the fanny pack. In other words, the Court cannot conclude that the pat-down of the fanny pack exceeded the scope of *Terry* on this basis.[23]

Defendant avers that in the event the Government argues that the fanny pack presented at the Hearing is not the fanny pack Defendant wore when frisked, there is insufficient evidence to find that Detective Petrucci could feel the pills through an unknown and uncollected bag as "officers must collect or at a minimum document the relevant evidence, including the bag in question" when seeking to rely on the plain feel doctrine. Def. Supp. Br. at 26 (citing *United States v. Nelson*, Crim. No. 21-613, 2022 WL 4774417, at *1 (D.N.J. Oct. 3, 2022) then *United States v. Gadson*, Crim. No. 20-79, 2021 WL 2566721, at *1 (D.N.J. June 23, 2021)). The Court has reviewed both cases cited by Defendant, as well as the evidentiary hearing transcripts in those cases. It appears that the seized bags in these cases were retained by law enforcement and presented at the evidentiary hearings in the respective matters as Government exhibits. However, the cited opinions do not mention this fact, nor do they address or support Defendant's contention that officers *must* collect or document a bag when relying on the plain feel doctrine to support a frisk of that bag. After an exhaustive review, the Court could not find any support for Defendant's position that collection, retention, or documentation of the bag here was *required*.

---

[23] Defendant also asks this Court to conclude there is no way that Detective Petrucci could have felt the pills with these other items in the bag and the bag's padding. As explained above, the Court has not adopted the requested adverse inference that the fanny pack presented at the Hearing was the fanny pack Defendant wore when frisked. However, the Court agrees with Defendant that it is highly unlikely that Defendant was holding a toothbrush and toothpaste when approached by law enforcement. Even assuming *arguendo* that the toothbrush and toothpaste were inside the fanny pack when Defendant was frisked, the Court—having thoroughly examined the fanny pack and considered the record before the Court—would nevertheless credit Detective Petrucci's testimony that he felt pills inside the fanny pack when frisking it for a weapon, even if there were also a toothbrush and toothpaste also inside it, and even considering the bag's padding.

Defendant next asserts that Detective Petrucci could not discern from the frisk whether the objects he felt were contraband, over-the-counter pills, or even candies, and thus, he did not have probable cause to search the fanny pack until he opened the fanny pack and confirmed what he felt. Def. Supp. Br. at 28 (citing *United States v. Collins*, Crim. No. 24-782, 2025 WL 1682596, at *3 (D.N.J. June 16, 2025)). "Although the plain feel doctrine requires that the incriminating character be immediately apparent, *it does not require absolute certainty that the object is contraband.* To the contrary, the plain feel doctrine, like the plain view doctrine, only requires that the officer have probable cause to *believe* that the object is contraband by the time he realizes it is not a weapon." *Jones*, 303 F. Supp. 2d at 706 (emphasis added) (citing *Arizona v. Hicks*, 480 U.S. 321, 327 (1987); then *Dickerson*, 508 U.S. at 376); *Yamba*, 506 F.3d at 259 ("If, before [an officer determines that an object is not a weapon], the officer develops probable cause to *believe*, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search.") (emphasis added). "An officer may seize an item contained in packaging which, in his or her experience, is commonly used for illegal drugs." *United States v. Hankerson*, Crim. No. 21-418, 2021 WL 4810847, at *11 (D.N.J. Oct. 15, 2021) (citing *United States v. Thomas*, 138 F. App'x 759, 761-62 (6th Cir. 2005), which found that officers can rely on their experience and the nature of the object in determining whether an item is contraband)).

Between the Incident Report and Detective Petrucci's testimony, the Court understands that at the moment of the frisk, law enforcement had corroborated several components of the CI's tip, including that: (1) the individual who the CI told law enforcement sold illegal prescription pills from his black Nike fanny pack was in the area the CI stated he would be; (2) this individual matched the physical description provided by the CI; (3) this individual was wearing the black Nike fanny pack (which the CI said this person was known to carry a firearm in); and (4) this

29

individual was seen opening multiple doors and moving a box into the trunk of the Buick (the car the CI said this individual drove). *See* D.E. 122. Detective Petrucci also testified that this area is "known as an open-air narcotics sales location" where "mainly" pills are sold. Tr. at 10:20-24. In addition, the Court has found that both the initial tip and Detective Rodriguez's day-of observations were conveyed to other members of law enforcement, including Detective Petrucci. *See supra* Section II.A.1.

Considering the information law enforcement and Detective Petrucci knew at the time of the frisk, there was probable cause to search the fanny pack once Detective Petrucci felt what he identified as loose pills. In making this determination, Detective Petrucci "went off of [his] training and experience and the information that was given to [him] by Detective Rodriguez." Tr. at 37:13-15. He testified that he had conducted hundreds of pat-downs and frisks prior to the frisk of Defendant and some of those involved frisks of small bags. *Id.* at 8:4-9:5. Based on this information—most importantly that an individual matching the CI's description and who the CI said sold illegal prescription pills from a black Nike fanny pack—Detective Petrucci had probable cause[24] to believe that the objects he identified in the black Nike fanny pack he was frisking were contraband. In a similar circumstance, a court recently explained:

> It was immediately apparent to [the officer who conducted the pat-down] that the circular shaped objects [in defendant's pants] were pills either loose or in a baggie, and he suspected that they may be illegal narcotics. [The] [o]fficer [] based these item recognitions upon his experience as a police officer of over 10 years who was conducted and participated in several [] drug related investigations. During those investigations, [the officer] has become familiar from his training and experiences

---

[24] Probable cause "does not require 'proof beyond a reasonable doubt, or by a preponderance of the evidence.'" *Hankerson*, 2021 WL 4810847, at *11 (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). Thus, Detective Petrucci's "belief need not necessarily 'be correct or more likely true than false.'" *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). All that was required is "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Id.* (quoting *Brown*, 460 U.S. at 742).

on the job with how [] pills feel during a pat down. Therefore, [the] [o]fficer [] had sufficient probable cause to believe that the items that he felt were contraband, based on how they felt during his pat downs.  Here, as in *Jones*, "[u]pon grasping the object[s] and recognizing [they were a pistol magazine and drugs], [the officer] was entitled to seize the object[s] under the so-called 'plain feel' doctrine." 303 F. Supp 2d at 706.

*United States v. Richardson*, Crim. No. 24-146, 2025 WL 2029870, at *14 (E.D. Va. July 21, 2025) (citation modified); *see also Avalos Gallegos*, 2019 WL 1645998, at *7 (recommending in *dicta* that if the district court reached the issue of the scope of the pat-down of defendant's pants that it should find that the frisk comported with the plain frisk doctrine).[25]  Thus, the Court concludes that Detective Petrucci had developed probable cause to search the fanny pack upon his identification of the pills.

After a thorough review of the record, the Court does not discredit Detective Petrucci's testimony that he felt pills during the frisk of Defendant's fanny pack.  The Court also finds that he had probable cause to then search the fanny pack following the frisk.  Because the Government has established by a preponderance that law enforcement's conduct in stopping Defendant, frisking him and his fanny pack, and then subsequently searching his fanny pack were constitutional, the Court will **DENY** Defendant's Motion.

---

[25] Defendant also argues that Detective Petrucci did not have probable cause to search the fanny pack because law enforcement cannot search a person's property carrying suspected pills without facts suggesting those pills are not over-the-counter pills or pills properly prescribed, and law enforcement did not ask Defendant if he had a prescription. Def. Supp. Br. at 28 (citing N.J.S.A. § 2C:35-24).  Contrary to Defendant's assertion, at the time of the frisk, there were facts suggesting the pills Detective Petrucci felt were not over-the-counter medicine or properly prescribed pills— namely, that law enforcement had received a tip that an individual sold illegal prescription pills from a black Nike fanny pack and this frisk occurred in an open air narcotics market where mainly pills were sold.

## IV.    THE GOVERNMENT'S 404(b) MOTION

Because the Court denies Defendant's motion to suppress, the Court will now address the Government's motion *in limine* which seeks admission of two of Defendant's prior convictions under Federal Rule of Evidence 404(b).  Gov. Mot.  As explained below, the Court will **GRANT in part** and **DENY in part** the Government's Motion.

### A.    Admissibility of Defendant's 2005 and 2012 Convictions

Defendant has previously been convicted of two drug-distribution offenses:  (1) in 2005, for possession with intent to distribute a controlled substance[26] in a school zone (the "2005 Offense"); and (2) in 2012, for possession with intent to distribute a controlled substance[27] in a school zone (the "2012 Offense")[28] (collectively, the "Prior Convictions").  Gov. Mot. at 4-5 (citing the 2013 PSR ¶¶ 90-91, 100-01).

The Government contends that the Prior Convictions are admissible because they are both probative of Defendant's knowledge of the controlled substances he possessed and intent to distribute them and that they present no unfair prejudice that substantially outweighs their probative value.  Gov. Mot. at 3-4.  Defendant argues that in seeking to admit these convictions "the [G]overnment reveals it is trying to do exactly what the law does not permit: ask the jury to make an inference that because [Defendant] dealt drugs in the past, he must have done so on the day in question. That is not permitted."  Def. Opp'n at 3-4.

---

[26] Specifically, 28 glassine envelopes of heroin.  Gov. Mot. at 4 (citing D.E. 90-1 (the "2013 PSR") ¶ 91).

[27] Specifically, 68 vials of cocaine.  Gov. Mot. at 5 (citing 2013 PSR ¶ 101).

[28] In 2012, for this offense, Defendant was also convicted of aggravated assault and unlawful possession of a firearm.  Gov. Mot. at 4.  Because the parties' arguments concern the drug-related conduct, the Court's analysis of and references to the 2012 Offense, unless stated otherwise, solely concern Defendant's 2012 drug-related conviction.

Indeed, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be used in a criminal case for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Courts employ a four-part test for admission of Rule 404(b) evidence: (1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must not be substantially outweigh by its potential for unfair prejudice; and (4) the Court must charge the jury to consider the evidence only for the limited purposes for which it is admitted. *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Lee*, 573 F.3d 155, 166 (3d Cir. 2009). In ruling on the admissibility of evidence under Rule 404(b), courts should not assess the credibility or weight of the other act evidence, but should only determine whether the jury could reasonably find the necessary facts by a preponderance of the evidence. *See United States v. Bergrin*, 682 F.3d 261, 278-79 (3d Cir. 2012). The party seeking to admit evidence under Rule 404(b)—here, the Government—bears the burden of establishing that the evidence is admissible. *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014).

### 1.   *Factors 1 and 2:  Non-propensity purpose and relevancy to that purpose*[29]

To meet its burden of proof on the second count of the Superseding Indictment,[30] the Government must prove that Defendant possessed the fourteen oxycodone pills recovered from the fanny pack both knowingly and with the intent to distribute them. *See* 21 U.S.C. § 841(a)(1).

---

[29] Courts often analyze the first and second factors of the *Huddleston* test—the purpose for admitting the "other act" evidence and its relevance—together. *See, e.g.*, *United States v. Givan*, 320 F.3d 452, 460-61 (3d Cir. 2003).

[30] D.E. 76.

The Government anticipates that Defendant will contest both the knowledge and intent to distribute elements of Count Two given the drug quantity at issue and the manner in which the drugs were stored when seized, and therefore seeks to admit the Prior Convictions to establish both of those elements. Gov. Mot. at 7. The Third Circuit has explained:

> Knowledge and intent are indeed proper purposes under the first part of our Rule 404(b) test. And "[t]here is no question that, given a proper purpose and reasoning, drug convictions are admissible in a trial where the defendant is charged with a drug offense." [*United States v. Sampson*, 980 F.2d 883, 88[7] (3d Cir. 1992)]. We have held, for example, that **evidence of past distribution is relevant to prove knowledge of the same or different drug in a later distribution trial.** *E.g.*, *Givan*, 320 F.3d at 461 ("The evidence that Givan had been convicted of distribution of cocaine makes Givan's knowledge of the presence of the heroin more probable than it would have been without the evidence."); *United States v. Boone*, 279 F.3d 163, 187 (3d Cir. 2002) (considering the defendant's past cocaine-distribution acts as evidence that he was not "an ignorant 'go-fer.'"). . . . And we have held that **evidence of past distribution is relevant to prove intent to distribute in a later distribution trial.** *E.g.*, [] *Lee*, 573 F.3d [at] 166 [] ("Lee's prior drug trafficking conviction was properly admitted as evidence that Lee intended to distribute any drugs in his possession."); *Givan*, 320 F.3d at 461; *Boone*, 279 F.3d at 187. We have even held that evidence of past distribution is relevant to prove knowledge of a different drug in a later possession trial. *United States v. Lopez*, 340 F.3d 169, 174 (3d Cir. 2003).

*United States v. Davis*, 726 F.3d 434, 442-43 (3d Cir. 2013) (emphases added).

"To be relevant, proffered evidence must fit into 'a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference.'" *United States v. Repak*, 852 F.3d 230, 243 (3d Cir. 2017) (quoting *id.* at 442). "'[T]his chain [must] be articulated with careful precision because, even when a non-propensity purpose is 'at issue' in a case, the evidence offered may be completely irrelevant to that purpose, or relevant only in an impermissible way.'" *Id.* (quoting *Caldwell*, 760 F.3d at 281).

The Government intends:

> to use the Drug Distribution Offenses to establish the non-propensity inference that [Defendant's] prior drug distribution offenses, in which [he] possessed drugs knowingly and with intent to distribute them, make it more likely that [he]

possessed the oxycodone found in his fanny pack knowingly and with intent to distribute it. *See Givan*, 320 F.3d at 461 (approving this inference in drug-distribution case). The introduction of evidence that [Defendant] had previously knowingly and intentionally distributed drugs in his possession shows that his possession of drugs on this occasion has a higher probability of being associated with drug trafficking than if he had simply possessed fourteen oxycodone pills accidentally, or at least without an intent to sell them. The prior conviction indicates that [Defendant] does have knowledge of how to possess drugs and how to distribute them, and that when he does possess drugs, he intends to distribute them (as opposed to consume them himself).

Gov. Mot. at 8.

Defendant counters that the above inference proposed by the Government is impermissible because the Government's chain requires a jury to conclude that because Defendant dealt drugs (or intended to) in the past, he intended to on the day in question as well. Def. Opp'n at 3-4. Defendant primarily relies on *United States v. Smith* in making his argument. *See id.* (citing 725 F.3d 340, 346 (3d Cir. 2013)). In *Smith*, a prior drug conviction on a particular street block was not admissible to show motive in a subsequent trial for an assault based on the theory put forward by the Government that the defendant had "a continuing interest in his turf." *Smith*, 725 F.3d at 346. The Third Circuit reasoned that "the Government used the [prior] drug deal to prove [defendant's] character [as a drug dealer] in order to show that on a particular occasion [defendant] acted in accordance with th[at] character." *Id.* at 345-46 (citation modified). The Government's inability to show "how or why [defendant] would have 'turf' to protect if he were not a drug dealer" meant their proposed chain of inferences included the impermissible link that [defendant] was acting in accordance with his character as a drug dealer. *Id.* at 346 n.2. Thus, to be admissible, "Rule 404(b) evidence [must] be established without an inference that the party against whom it is admitted acted in conformity with whatever the evidence of the prior act says about his or her character." *Id.* at 345. Evidence is not excluded "simply if it invites character inferences, but only

35

[if] [it] is used to prove a person's character and that invites the inference that the person acted in conformity with that character." *Id.*

Building on *Smith*'s reasoning, Defendant argues that the Government's proposed chain of inferences in this case also requires the conclusion that because Defendant intended to distribute controlled substances in the past, he must have intended to do so here as well. Def. Opp'n at 10-11. But in making this argument, Defendant misstates the Government's proposed chain of inferences and misapplies *Smith*. Unlike in *Smith*, here, the chain of inferences is not that because Defendant intended to distribute drugs in the past, he acted in accordance with that character on the day in question; nor, like in *Smith*, is the prior conviction for drug distribution being used to show motive. Instead, the Government's proposed inferential chain is that Defendant's previous convictions for possession of controlled substances with the intent to distribute them make it more likely that his possession of controlled substances here was with intent to distribute them (as opposed to personally consuming them). *See* Gov. Mot. at 8. As the Government notes, this exact chain has been approved by the Third Circuit. *See, e.g.*, *Givan*, 320 F.3d at 461. Moreover, this reasoning applies to Defendant's *knowledge* of the oxycodone as well. *See id.* ("The evidence that [defendant] had been convicted of distribution of cocaine makes [his] knowledge of the presence of the heroin more probable than it would have been without the evidence as it indicates that [defendant] had knowledge of drugs and drug distribution, and thus that it was less likely that he was simply in the wrong place at the wrong time.").

Defendant asserts that two cases the Government relies on, *United States v. Garner*, 961 F.3d 264, 274 (3d Cir. 2020) and *United States v. Boone*, 279 F.3d 163, 187 (3d Cir. 2002), do not support admission of the Prior Convictions. Def. Opp'n at 8-10. In *Garner*, the Third Circuit affirmed the use of a prior conviction for cocaine trafficking to prove knowledge of cocaine and

how to sell it. 961 F.3d at 274. The Third Circuit also noted in *Garner* that the District Court did not admit the prior conviction to prove intent and knowledge of packaging heroin, a different drug. *Id.* From this, Defendant deduces that *Garner*, in conjunction with *Smith*, "further supports denial of the Government's motion to admit both convictions." Def. Opp'n at 9-10.

The Court disagrees with Defendant's position that *Garner* has limited or overturned *Givan*'s holding that a prior conviction involving the distribution of one drug cannot establish knowledge in a subsequent case involving the distribution of another drug.

*First*, Defendant extrapolates too broadly from *Garner*. *Garner*'s holding that a prior cocaine trafficking conviction could be admitted to prove knowledge and intent in a subsequent cocaine distribution case does not address whether a prior conviction for distributing one drug is admissible to support a subsequent charge for distributing a different drug. Indeed, the Third Circuit did not address this "different drug" question because the issue was not before it.

*Second*, the Third Circuit made clear in *Garner* that any argument to overturn *Givan*'s reasoning that a previous conviction for distributing one drug can prove knowledge and intent to distribute another drug in a future case "is a nonstarter because only the [Third Circuit] sitting *en banc* can overturn a prior precedent." *Garner*, 961 F.3d at 273. Therefore, *Givan* is still good law in this Circuit, and the Court relies on it to conclude that the Prior Convictions make Defendant's "knowledge of the presence of the [oxycodone] more probable than it would have been without the evidence as it indicates that [Defendant] had knowledge of drugs and drug distribution, and thus that it was less likely that he was simply in the wrong place at the wrong time." 320 F.3d at 461.

With respect to *Boone*, Defendant is correct that the facts of *Boone* are distinguishable from the present. The court there admitted prior convictions for cocaine distribution in a subsequent

case about cocaine distribution, which is different from the present case, in which the Government seeks admission of two prior convictions for cocaine and heroin distribution to demonstrate knowledge and intent to distribute oxycodone.  Def. Opp'n at 10.  Yet Defendant offers no reason why other Third Circuit cases, including *Givan*,[31] *Lee*,[32] and *United States v. Moffitt*,[33] do not apply to this case.  In those cases, the Third Circuit affirmed the admission of evidence of prior drug distribution offenses to prove knowledge and intent in subsequent cases involving different controlled substances.  In fact, the Third Circuit in *Lee* made clear that a defendant's "prior drug trafficking conviction was properly admitted as evidence that [he] intended to distribute *any* drugs in his possession."  573 F.3d at 166 (emphasis added); *see also United States v. Jackson*, 619 F. App'x 189, 193 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 992, (2016), (noting the Third Circuit has previously "held that evidence of past distribution is relevant to prove intent to distribute in a later distribution trial, even to the extent of admitting prior convictions as well as uncharged conduct").  In short, the Government has proposed a proper purpose for the admission of the evidence and has demonstrated a permissible logical chain.

Defendant also argues that "nothing about the prior heroin conviction or cocaine conviction (in which individually packaged drugs were recovered) supports an inference that [Defendant] intended to distribute the fourteen loose oxycodone pills allegedly found on June 11, 2021."  Def.

---

[31] 320 F.3d at 461.

[32] 573 F.3d at 166.

[33] 601 F. App'x 152, 155 ("The two prior convictions the Government introduced were for possession with intent to distribute and possession with intent to deliver controlled substances. Given that [defendant] challenged his intent to participate in the drug distribution scheme in this case, it was not an abuse of discretion for the District Court to determine that his past acts of drug distribution were relevant to whether he had that intent here.").

38

Opp'n at 11.  Although that level of specificity is not required by the law,[34] the Court disagrees

with Defendant that the Prior Convictions do not support the inference that Defendant had

knowledge of the pills and the intent to distribute them.  In the Court's view, there are sufficient

similarities between the 2005 and 2012 Offenses to support an inference that Defendant intended

to distribute the pills found in the fanny pack, including that Defendant previously kept drugs he

intended to distribute in a black pouch and that he twice intended to sell drugs in the two block

vicinity of where he was arrested in 2021.  In fact, Defendant previously pled guilty to intending

to distribute controlled substances on the same street corner on which he was arrested in 2021.

Gov. Mot. at 8-9 (citing 2013 PSR ¶¶ 91, 100).

    Finally, the Court addresses Defendant's argument that the time between the Prior

Convictions and the present offense limits their relevancy.  Def. Opp'n at 7.  Rule 404(b) "does

not establish a maximum time interval between the prior conviction and the charged conduct as a

determinant for admissibility of the prior conviction."  *United States v. Cardona-Rosario*, 285 F.

App'x 20, 23 (3d Cir. 2008).  In *Cardona-Rosario*, the admission of a prior drug distribution

conviction involving a temporal gap of twelve years was upheld; the Third Circuit reasoned that

"[it] cannot say that the District Court abused its discretion in admitting evidence of [defendant's]

prior conviction solely on the basis of the passage of time following that conviction."  *Id.* (internal

quotations omitted).[35]  In reaching this conclusion, the Third Circuit noted that it had previously

affirmed the admission of a ten-year-old conviction for the purpose of proving criminal intent.  *Id.*

---

[34] Several cases from the Third Circuit have admitted prior convictions where those convictions
involved different drugs and meaningfully different situations than in the subsequent actions.  *See,
e.g.*, *Lopez*, 340 F.3d at 174 (admitting a conviction for participating in a conspiracy to distribute
cocaine when defendant was on trial for possession of heroin found in a sock in his prison cell).

[35] Notably, the prior conviction involved distributing a different controlled substance than the drug
in the subsequent charge.

(citing *Lopez*, 340 F.3d at 171, 174); *see also United States v. Schwartz*, 315 F. App'x 412, 419 (3d Cir. 2009) (affirming admission of thirteen year-old conviction and citing approvingly to two cases from other circuits which upheld the admission of convictions that were eighteen and twenty years old); *United States v. Daraio*, 445 F.3d 253, 265-66 (3d Cir. 2006) (upholding admission of Rule 404(b) evidence, including tax returns that were over twenty years old). Applying the Third Circuit's reasoning here, the Court concludes that the temporal gap between the Prior Convictions and Defendant's arrest in 2021 for the charged conduct does not, by itself, limit their relevancy or probative value.[36]

In sum, the Court finds the Government has identified two proper purposes for the Prior Convictions—knowledge and intent—and that the Government has identified "a chain that connects the [Prior Convictions] to [these] proper purpose[s], no link of which is a forbidden propensity inference." *Davis*, 726 F.3d at 442. The first two factors therefore weigh in favor of admitting the Prior Convictions.

### 2. *Factor 3: 403 balancing*

The Court must next evaluate, under Rule 403, whether the probative value of the Prior Convictions is substantially outweighed "by the inherently prejudicial nature of prior bad act evidence." *Caldwell*, 760 F.3d at 277. "Prior bad act evidence has a 'uniquely prejudicial impact'

---

[36] Bolstering the Court's conclusion is the fact Defendant spent a meaningful portion of the time between offenses incarcerated. *See United States v. Morton*, 461 F. App'x 252, 254 (4th Cir. 2012) ("Although approximately thirty years have passed since [defendant] was convicted of committing the prior robberies, those convictions are similar to the charged offenses, and [defendant] spent much of the intervening time incarcerated.") (citations omitted)); *see also United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006) ("Because [defendant] had been out of prison for only eight years before committing the instant offense, the total number of years separating the prior offense and the charged offense did not significantly diminish the probativeness of the evidence.") (citation omitted).

on a jury," *United States v. Weinstein*, Crim. No. 24-128, 2025 WL 391242, at *12 (D.N.J. Feb. 4, 2025) (quoting *id.* at 275), because a jury may infer that the prior bad act "demonstrate[s] the propensity of the defendant to do acts similar to those charged," *United States v. Green*, 617 F.3d 233, 240 (citation omitted) (3d Cir. 2010)).

The parties agree, albeit to differing degrees, that the Prior Convictions are prejudicial. Gov. Reply at 3; Def. Opp'n at 11-14. The prejudicial nature of the Prior Convictions is strong because Defendant faces charges for possessing and intending to distribute a controlled substance, which is almost identical to the Prior Convictions. *See Weinstein*, 2025 WL 391242, at *12 (citing *United States v. Puco*, 453 F.2d 539, 542 (2d Cir. 1971) which noted that "[t]he potential for prejudice . . . is greatly enhanced where . . . the prior offense is similar to the one for which the defendant is on trial" (citations omitted)).

Nevertheless, evidence is excluded "only if its *unfairly* prejudicial effect *substantially* outweighs its probative value." *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002) (emphasis added). Thus, "even a large risk of unfair prejudice may be tolerable" "when the evidence sought to be admitted is highly probative." *Id.* In that vein, while the Court recognizes that the Prior Convictions (like all prior convictions) are prejudicial, it finds that the unfair prejudice associated with them does not substantially outweigh the probative value and proper purpose of the Prior Convictions to prove Defendant's knowledge and intent over the pills. As explained above, Defendant's knowledge of the pills and his intent to distribute them are anticipated to be key issues at trial, and the Prior Convictions are highly probative as to Defendant's knowledge and intent.[37]

---

[37] For example, Defendant may dispute that his possession of the pills was for personal consumption. In his Supplemental Brief, Defendant noted that in certain circumstances, an individual is permitted in New Jersey to carry up to a 10-day supply of certain medications outside of their original packaging, something he claims law enforcement did not ask him. Def. Supp. Br. at 29 (citing N.J.S.A. § 2C:35-24).

Defendant previously kept drugs he intended to distribute in a black pouch and twice intended to sell drugs in the two block vicinity where he was arrested in 2021, including once on the same street corner.  Gov. Mot. at 8-9 (citing 2013 PSR ¶¶ 91, 100).  Even when considering the prejudicial nature of the Prior Convictions, the Court concludes that their probative value is not substantially outweighed by any danger of unfair prejudice.  *See United States v. Curry*, Crim. No. 04-280, 2006 WL 8433577, at *1 (D.N.J. May 19, 2006) (finding that the probative value of prior convictions for drug-related offenses to prove a defendant's knowledge and intent to distribute narcotics is not substantially outweighed by any inherent danger of unfair prejudice); *see also United States v. Byrd*, Crim. No. 17-299, 2022 WL 2757685, at *1 (W.D. Pa. July 14, 2022) (same); *United States v. Landfried*, No. 19-8, 2021 WL 5417515, at *2 (W.D. Pa. Nov. 19, 2021) (finding that the prejudice associated with a prior conviction did not substantially outweigh the probative value of the  prior conviction because the defendant's "knowledge and intent" were "crucial elements to the charges against him").

In addition to the Prior Convictions themselves, it appears the Government might seek to introduce evidence concerning the facts and circumstances surrounding Defendant's prior drug-related convictions, including the locations of the crimes and the fact Defendant kept the drugs in a black pouch.  *See* Gov. Mot. at 8-9; Def. Opp'n at 13.  These facts are highly probative of Defendant's knowledge of the pills in the fanny pack and make it more likely than not that he acted with the required intent.  *See United States v. Gardenhire*, Crim. No. 15-87, 2017 WL 1355151, at *7 (W.D. Pa. Apr. 13, 2017) (finding that a defendant's prior conviction for intent to distribute drugs makes it more likely than not that he acted with the required intent as charged).  Thus, the Court concludes that the probative value of these facts is not substantially outweighed by any unfair prejudicial effect present; therefore, the Court will allow the Government to introduce at

trial facts from the Prior Convictions that are narrowly tailored to the facts and circumstances of the drug possession and distribution-related conduct.

Defendant notes the Government might also seek to introduce facts at trial related to the Prior Convictions but that are unrelated to the drug-related components of those offenses. Def. Opp'n at 13-14. As noted above, *see supra* n.28, the 2012 Offense includes, in addition to the drug-related conviction, convictions for aggravated assault with a weapon and the unlawful possession of a handgun. Gov. Mot. at 14. The Court agrees with Defendant that the unfair prejudice associated with these non-drug related convictions substantially outweighs any probative value (to the extent there is any) because a jury is likely to be highly prejudiced by this conduct, which does not speak to either Defendant's knowledge of the pills or his intent to distribute them. Therefore, they are inadmissible at trial. Relatedly, any facts exclusively associated with the aggravated assault and firearm charges are similarly inadmissible.

Defendant also objects to the Government's effort to introduce the 2012 Judgment of Conviction, arguing it is unduly prejudicial. Def. Opp'n at 14. After reviewing the Judgments of Convictions which were submitted as trial exhibits, the Court agrees that heavy redactions to the 2012 Judgment of Conviction might lead to speculation amongst jurors about what exactly is redacted. This problem is exacerbated by the 2005 Judgment of Conviction, which, unless similarly modified, would not have the same redactions. To potentially avoid this issue, the Government proposed a stipulation in lieu of the actual Judgments of Conviction. Gov. Reply at 3. Accordingly, the Court will order the parties to meet-and-confer and jointly propose a stipulation for the Court's consideration.

3.    *Factor 4: A limiting instruction*

If Defendant requests, the Court must provide a limiting instruction to the jury when the other acts evidence is introduced.  *See Davis*, 726 F.3d at 445 (noting the district court should provide the requested limiting instruction at the time the evidence is admitted).  A proper limiting instruction makes clear that the evidence cannot be used to demonstrate a defendant's bad character or propensity to commit crimes as required before admitting prior bad act evidence before the jury. *See United States v. Vega*, 285 F.3d 256, 264 (3d Cir. 2002).  Juries are presumed to follow limiting instructions, *see Repak*, 852 F.3d at 247, and a limiting instruction can minimize any prejudicial effect of the prior bad act, *Givan*, 320 F.3d at 461-62.

The parties have proposed a limiting instruction which is based on the model Third Circuit jury instructions.  At the upcoming final housekeeping conference, the Court will inform the parties of any modifications to the proposed instruction.

## V.    CONCLUSION

For the reasons explained above, the Court: (1) finds that the Government has proven by a preponderance of the evidence that the frisk of Defendant's fanny pack and the subsequent search did not violate his Fourth Amendment rights, and therefore, **DENIES** Defendant's Suppression Motion; and (2) **GRANTS in part** the Government's 404(b) Motion such that the Government is permitted to introduce at trial facts and evidence related to Defendant's prior two drug-distribution related convictions, but may not introduce evidence or facts concerning unrelated conduct involved in those convictions.  An appropriate order accompanies this opinion.

Dated: 8/27/2025

Evelyn Padin, U.S.D.J.